Morning, Your Honors. My name is John McCoy. I have the privilege of representing Eldy Beloso, who is known in these proceedings by her maiden name, Eldy Castro. And I would like to reserve approximately two minutes for rebuttal. As the Court is aware from the briefs, the government and we differ slightly in terms of formulation of the issue before this Court. But I don't think there's any dispute that the ultimate practical question here is whether Ms. Beloso will be able to remain in the United States with her husband, a naturalized citizen, her two children, Jennifer and Natalie, 14 and 16, both of whom are citizens who were born here in Los Angeles. The government has argued that the appropriate standard for this Court to apply in reviewing the decision is an abuse of discretion standard. We've argued in our brief, and I contend that the appropriate standard of review is a de novo review. The question before the Court is a settled record. There are no disputed questions of factual or evidentiary issues before the Court. And I believe the appropriate standard is set forth in this Court's decision in De Sere v. Ilchert, which is 840 Federal Reporter 2nd, 723. The case cited by the government, the Padilla case at 21F 3rd, 970, also sets forth the appropriate use of discretion standard applied. That was because there were evidentiary issues resolved in the Court below. And that called for the use of discretion standard. Padilla itself indicated that if there were merely a question of applying questions of law, then it would be de novo review. There is no dispute that, from a technical standpoint, the request to reopen Ms. Beloso's immigration proceedings to seek relief under the Legal Immigration and Family Equity Act would not have been timely under the provisions of CFR 3.23b1, in that it was filed more than 30 days after the entry of the prior order, prior final administrative order. But my understanding of the record is the reason that final entry was ordered. She had a pending timely appeal from the prior denial of a motion to reopen. And I believe the record strongly suggests that the only reason that appeal was voluntarily dismissed was because her counsel at that time believed that that would provide an opportunity for her to seek relief under the Life Act, given the very short window that was available. Now, at that point, did she have any other option? Could she have asked the BIA for relief, or was that a, you know, strategic error by her counsel to do that? Well, I'm not sure. I don't know what would have happened if she would have asked the BIA for relief. The statute seems to indicate relief is to be sought in the immigration court. I think that her prior counsel made clear to the BIA, by saying that the appeal was being dismissed in order for the case to be returned to immigration court to seek relief, that it was an attempt to comply with the very narrow timing requirements of the Life Act. And that's why we believe the doctrine of substantial compliance comes into play here. Well, I think that Judge Bordelai's question is quite pertinent. Isn't there a manner in which the INS can be asked to join the motion? Yes, Your Honor. And I'm glad you brought that up, because that was mentioned in the BIA decision, and again, in the government's brief before this Court, a reference to the fact that there are these procedures. And I was very disturbed by that, because when I was appointed to handle this case, I saw that reference in the BIA Court. And I wrote letters to the district counsel. I made phone calls. I cannot find someone who is willing to admit to having responsibility for making those decisions in this case. And when my colleague, Mr. O'Connor, contacted me after being brought on board to handle the appeal in this matter, I raised that issue with him, pointing out that clearly, given the equities of this case, given the personal situation of Ms. Beloso, it was a case that cried out to me that it didn't need to be litigated. And Mr. O'Connor's response to me, and obviously, I'm paraphrasing, but was that his job was to process the appeal. It would come to his desk. He would write the briefs. He's not even here. His job was to what? His job was to handle the appeal. Yeah. Litigate the appeal. And so to this day, pending this argument, I would invite some response from the service to file a joint motion. I think clearly the equities are there. And I can't speak to exactly why that didn't happen in the court below, because I was not counsel at that time. But I think that suggests some of what happened there. You know, I think we're familiar generally with how immigration court proceeds. I think that there has been a lot of complexity added by the transition from the INS into the Department of Homeland Security. It is something that I think we can all agree should have happened, and it would have been best if it happened. And I hope it will still happen, because clearly the fair and equitable outcome here, and the humane outcome, and the outcome that's consistent with the clear intentions of the LIFE Act, the intentions that are articulated in the quote from the House Commission that's cited at the end of our reply brief. How would it happen at this point? At this point, Your Honor, I assume what would happen is that there would be a joint motion made to reopen. My understanding, and I'm not primarily an immigration law expert, but perhaps that motion would be made in the district, or rather in the immigration court. If that motion were made, it might be possible that we could jointly agree that this appeal would be moot in light of that, and the appeal could be dismissed. I think procedurally we could get there from here, Your Honor, given a joint commitment to that process. And, you know, perhaps after this I will talk further with Mr. O'Connor. But if I can get in touch with someone at the service who has, or at least admits to having that responsibility and that authority, certainly, of course, I'd like to pursue. Well, what do you make of the fact that the INS did not oppose, file an opposition to her motion to reopen? I'm not sure. I believe the INS did oppose the motion to reopen, Your Honor, unless I'm mistaken. Well, I'm sorry. The INS didn't file an opposition to her appeal. I don't know what to make of that, Your Honor. That may have indicated a recognition of the equities of the case. Unfortunately, we ended up in this procedural posture where the voluntary dismissal of that appeal, which was clearly intended to attempt to comply with the requirements of the LIFE Act to seek that relief, resulted in the prior order of deportation becoming a final administrative order and therefore creating the apparent time bar under 3.23 to that motion. Now, did she timely file either a motion for a stay of deportation pending this appeal or with us or just a — did she? I believe, Your Honor, that there is a stay of deportation in effect from her — her immigration proceedings go back to 1989 when she came to this country and began to — the long process of eventually attempting to adjust her status. And my understanding is that there is still a stay of deportation in effect as a result of those proceedings. Aside from being eligible for adjustment under the LIFE Act, isn't she eligible for adjustment as the wife of a U.S. citizen? Well, that's the — that's the factual basis, Your Honor, that gives her eligibility under the LIFE Act. The LIFE Act allows for a motion to reopen proceedings to adjust status based on the close familial relationship with a U.S. citizen, which in this case would be both her husband, Mr. Veloso, who is a — has been a naturalized citizen since 1986, and their two children, Jennifer and Natalie, both of whom were born here and thus are U.S. citizens. All right. You wanted to reserve some time? Yes, Your Honor. Thank you. Good morning, Your Honors. May it please the Court, I am Blair O'Connor, representing the Attorney General in this matter. Your Honors, the petitioner in this case seeks an exception to the time limitation for filing motions to reopen or reconsider that simply does not exist under the LIFE Act, the LIFE Act amendments, or any other provision of the INA. The Board in this case properly found that because the LIFE Act and its amendments did not contain any special provisions for reopening or reconsideration cases when an deportation or removal, the time limitations for filing such motions containing 8 CFR 3.23 governed her case. Because her motion to reopen was filed well beyond 90 days of the final order of deportation in 1989 and well beyond September 30, 1996, it was correctly found to be untimely, and therefore, this Court should affirm the Board's decision and dismiss the petition for review. Mr. O'Connor, you've appeared here before, haven't you? Yes, Your Honor. You look familiar to me. Actually, I've been before you in Seattle, Your Honor. In Seattle? All right. I'm sure you have a lot better knowledge about the various provisions for relief under, is there a telephone or something going on back there? If there's some noise, please turn it off, whatever it is. Anyway, what kind of relief is available for a petitioner in this case? Technically, I would have to say I agree with you, but clearly, this case is a case where the INS, the result of your argument is to deport someone who's the mother of two U.S. citizen children, the spouse of a U.S. citizen, and the equities would really seem to favor her. Surely, there is some means of relief that perhaps her earlier counsel somehow disregarded, and perhaps you can tell me what that might be. Yes, Your Honor. We would point out the record does indicate that clearly, Ms. Castro has an approved I-130, which is an approved immediate relative visa petition based on her marriage now to a United States citizen. We'd also point out in the record, although I can't speak with 100% clarity that this would still be valid, but there is in the record an approved I-212, which is the permission to reapply for admission after deportation. Now, that was approved in January 1997. Unfortunately, the record is silent, and I don't know if Ms. Castro has ever, in fact, left the United States or if she's remained here the entire time period, but she did have at one point from the INS an approved I-212, and the reason that's important is that waives the 10-year bar, you know, should she be deported with that I-212. Again, I can't say for sure that because that's seven years old at this point that that would still be a valid document, but let's even assume that it's not. The service will no longer accept that. If she is deported and she goes back to Peru, she still has the approved immediate relative visa petition. She can apply for a new permission to reapply for admission after deportation, and should that be approved, that would waive the 10-year bar from her being able to reenter. With that and with the approved I-130, she would be eligible for an immediate relative visa petition, which would allow her to reenter the country lawfully, so therefore she would not be subject to the reinstatement provisions of having the order reinstated against her. So let's assume that the service would recognize either the I-212 waiver or the I-130. Why go through all this? Why deport her to Peru if she can turn around and immediately come back without the 10 years? Well, again, you know, I didn't write the law. Those are laws Congress has enacted, and, you know, and the service is bound to apply by those, and because that's the only legal way right now for her to do this, it does involve her having to go back to her country and apply for the visa there. And we think it's important to point out that when you look at the timing of this case, okay, she married in 1990. She has the approved visa petition in 1992. Section 245I, which is what enables aliens like her to apply for a permanent residence in 1994, October of 1994. I've checked, and her, because at the time she was married to a lawful permanent resident and not a citizen, I checked, and her visa became available in June of 1996. Therefore, she had a full four months in which to get her motion reopened, because, you know, the cutoff date was September 30, 1996. She had four months where she could have gotten a timely motion reopened to apply for adjustment status before the immigration court, and, you know, unfortunately, she slept on those rights. And that's the reason she's in this current predicament. I'm wondering if there is an opportunity now for the INS to file a joint motion for it to reopen. Again, certainly, Your Honor, that is something that my client would make the call on. I will point out that I'm not 100 percent confident it's something they'd be willing to do, because this is an alien who was granted voluntary departure. Because what? I didn't hear that. Because what? Because she was granted voluntary departure back in 1989, and she did not take that. I do know, again, I can't, I'm not going to speak absolutely certain what my client would do, but generally they do oppose. They only are willing to join in motions to reopen when the person is not a matter-of-char case. And when I say matter-of-char, that's when they say that someone who is given voluntary departure fails to accept that relief, because that's a contract that she agrees to with the service, that she'll leave within the time ordered, and she had six months in which to leave. When she doesn't do that, she then becomes ineligible for adjustment of status. Normally, my client does oppose motions. We're not joining motions when you have an alien in that situation. You mean she has to, because she has a valid stay from our courts. You're saying she would have to forego an appeal and accept the voluntary departure? Yes, Your Honor, because the voluntary departure period is long since expired. I mean, this is not a case where the Board, like, reinstated the voluntary departure in 1998 when the proceedings were again before it. This was something that was granted way back in 1989. It's long since expired. So it's not something – I mean, the voluntary departure issue, unfortunately, is no longer before this Court because it expired way back in 1989 or 1990. So that's the situation we're dealing with. I guess what bothers me is that this is a perfect example of a case where the Life Act was designed to rectify. We've got a citizen husband, two citizen children, not following that. It certainly creates a real problem with the family. I mean, if, in fact, she can't get back for 10 years, what's that do to the family? And that wasn't the intent of the Life Act. It's just – and I know that you're here to argue the technicalities of the appeal, and I understand that. It's just that, frankly, it took me a long time to try to figure out the – all of the various time limits and so forth. And this seems to be one where the technicalities of the procedure were such that I can understand how anyone would miss some of the timelines. Yes, Your Honor. I mean, again, the government clearly acknowledges that, you know, the purpose of the Life Act, again, was family reunification. That's why they extended the cutoff period for 245I, the adjustment of status, an additional length of time until April 30, 2001. But we would point out, as we point out in our brief, Congress was clearly aware of the time limitations for filing Motions to Reopen in the Life Act, because in Section 1505, Congress created two specific exemptions to that time limitations for two groups of aliens, aliens subject to the Nicaraguan Adjustment and Central American Relief Act, and aliens subject to the Haitian and Refugee Immigration Fairness Act. In Section 1505 of the Life Act Amendments, they exempted aliens in both those categories from the time and number limitations on Motions to Reopen to apply for adjustment of status. Those are the only exceptions to that time limitation for filing a Motion to Reopen that was in the Life Act. So clearly, if Congress had created a categorical exemption for all aliens applying under 245I to the time limitation for Motions to Reopen, it could have done that because it knew how to create those exceptions, but it did not. And therefore, we would say that notwithstanding the purpose of the Life Act, clearly Congress knew how to create that exception. The fact that they did not illustrates that aliens in Ms. Castro's position, who is subject to a final order of deportation, were not eligible to an exception to the time limitation for filing a Motion to Reopen. I would like to ask an additional question. Yes. And I think Judge Nelson has a question, too. As you have said something just earlier, the only way she can trigger an avenue of relief is to physically go back to Peru? Yes, Your Honor. Again, I mean, again, I'm not going to speak with 100 percent certainty of my client. I don't, I'll be honest, I don't recall the conversations with Mr. McCoy. Of course, they're off the record anyway, so you can create some new ones. But I do know that what I typically tell opposing counsel if they contact me is saying, look, I'd like to file a Motion to Reopen. Would the service be willing to join? I tell them, well, that's my client's call. I'd recommend calling the district counsel in your area to see if he would. And so, again, that's something that he can pursue. But once she gets to Peru, she has to, technically, she would have to stay for 10 years? No, no, no, Your Honor. The reason she can get around that is that she can apply for what we call permission to reapply for admission after deportation. It's a form, INS Form I-212. Could she create the same right by going to the Peruvian embassy? Yes, Your Honor. Here in the United States? I mean, the fiction is that the embassy of a country is a piece of that country. That's a great question. My gut is to say that I don't think she could do that. I think she'd like that a lot closer than Peru. I don't know where their embassy is. It's probably closer than flying to Peru. But you see the problem that we're laying on you. The old saying you learn in law school, hard cases make bad law. And frankly, you really have to hold your nose to come to the result that just doggedly following this path would get us to. And that's when you get bad cases, is judges don't like to do that. I completely understand that, Your Honor. Again, unfortunately, I just say that the way the law is written right now, she's no longer eligible to file a motion to reopen to apply for adjustment of status because she's beyond the time limits. And that's the only way to get that deportation order lifted, is to file a motion to reopen to apply for adjustment of status. Again, I didn't write the law. That's the way Congress has written the law. Again, I would stress that she would not be subject to the 10-year bar should she get the permission to reapply for admission. We know that the INS has already granted it to her once. It may be that they'll still say that's a valid document. Armed with that and with the approved visa petition, again, I would not imagine it would take that long. She's immediately available. She's immediately eligible now for a visa because she's married to a U.S. citizen. And so it's a matter of going back to Peru, getting the visa approved. Once she has the visa, she can make a lawful reentry into the United States as a lawful permanent resident because she's now married to a United States citizen. Would you mind telling me what she could have done if she'd have recognized all the appropriate technicalities? Could she really still have reopened? Yes, Your Honor, by all means. Again, her husband didn't naturalize until November of 1996. And that was after the time limit for filing a motion to reopen expired. But I did check. Because she was married to a lawful permanent resident at the time, her visa at what time? In 1994 when Section 245I was enacted. At that time, she was married to a lawful permanent resident. She had an approved visa at the time. She became eligible for a visa in June of 1996. That's when her priority date came up. Therefore, she had four months from June of 96 to September of 96 in which she could have filed a timely motion to reopen with an application for adjustment of status. Once that had been tendered in the immigration court, the adjustment of status application would have been adjudicated. And had it been granted, she would have been given lawful permanent resident status and the deportation proceedings would have been terminated. Would this lend itself to an ineffective assistance of counsel for failure to acknowledge that? I'm not going to speculate. Again, it's something that's an issue she's never raised before the board. It's not exhausted. It's not before this court. And then again, also the other thing is that she could have sought, once September 96 came and passed her honor and the motion to reopen was untimely at that point, she could have sought, and unfortunately there's no evidence in the record if she did, but she could have sought the INS to seek to join in her motion, which would then be an exception to the time and number limitations for filing this motion. It would have been timely because what? Could you clarify that for me again? It would have been timely had she filed before September 30th of 1996. Because of what? Because under ACFR 3.23. ACFR what? 3.23. What is ACFR? Pardon me? What is ACFR? 8 Code of Federal Regulations 3.23. That sets forth the time limitations for filing motions to reopen. Yeah. And it says that they must be filed within 30 days, or I'm sorry, within 90 days of the final order of deportation or September 30th, 1996, whichever is later. And the reason for September 30th, 1996 is what? Because it's in the regulation as being the later date by which she had to file a motion to reopen. And that later date was created by what? What's the reason for that? The reason for that is because in 1990, in the Immigration Act of 1990, Congress directed the Attorney General to create time limitations for filing motions to reopen. I see. And did so in 8 CFR 3.23. Okay. Any more questions? All right. Thank you very much, Counsel. Thank you. The one point I'd like to address on rebuttal is the response in the government's brief, and also here today by Mr. O'Connor, that the doctrine of substantial compliance should not be applied here because, in effect, Congress knew how to create exceptions and didn't create exceptions for people in Ms. Beloso's category. Clearly, the exceptions that Congress created were for people from a particular country, a particular class of people identifiable by their country of origin. That's simply not the situation Ms. Beloso is in. We're not arguing that she comes under the doctrine of substantial compliance because there's something unique about her having been of Peruvian descent. The issue here was this unique procedural quandary where she was in, where a prior adverse decision was on appeal, and likely would have remained on appeal through even the extended deadline for applying for relief under the LIFE Act. I think it's clear, if you look at the motion to voluntarily dismiss her appeal so that the case may be remanded to the immigration court, that what was going on was an attempt to deal with a very troubling procedural quandary in which she found herself. And prior counsel Mayer may not have made the best decision, but I think it was a decision that was made in a very difficult and confusing situation. And it's simply not reasonable to suggest that people in Ms. Beloso's category – I don't know that there was anyone else who was in the category in which she found herself. So the notion that somehow, by creating exceptions for identifiable classes of people from particular countries, Congress somehow, by the failure to create an exception for this so-called category of people in Ms. Beloso's situation, has, by negative implication, indicated an intent not to create what the government would call an exception, what I would call an equitable recognition of an attempt to comply with the requirements of the statute. I think that's just not a reasonable interpretation, and I don't think that the legislative history supports the reading the government would put on it. Thank you. Thank you both for an excellent discussion of these issues, and also to Mr. McCoy and his firm for taking this matter on. Instead of submitting this matter, is there any interest in perhaps talking to our Ninth Court in that manner? Mr. O'Connor? Well, what I'll do today is defer submission, and we'll send out an order requesting that each side notifies how much time do you need to talk to your client. I would say, you know, three or four weeks is definitely enough. All right. Okay. We'll put some reasonable deadline in there for notifying us as to whether or not you'd like to participate in the mediation program, and perhaps you could see, talk to Mr. O'Connor and see if you can identify anybody in the district counsel's office for you to talk with. All right. Thank you very much. And this matter will be, submission will be deferred on this matter. All right. We will now hear Richardson v. Cary.
judges: Hug, Tg Nelson, Wardlaw